Domenic E. Capriotty v. Commissioner.
Capriotty v. Commissioner
Docket No. 73980.
United States Tax Court
T.C. Memo 1961-254; 1961 Tax Ct. Memo LEXIS 94; 20 T.C.M. (CCH) 1329; T.C.M. (RIA) 61254; September 7, 1961
J. B. H. Carter, Esq., Fidelity-Philadelphia Trust Bldg., Philadelphia, Pa., for the petitioner. Edward L. Newberger, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent has determined deficiencies in the petitioner's income tax and additions to tax as follows for the indicated years: Additions to Tax
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 294(d)(2)
Year
Deficiency
I.R.C. 1939
I.R.C. 1939
I.R.C. 1939
1946
$ 9,586.70
$ 4,793.35
$ 869.83
$ 579.88
1947
13,185.36
6,592.68
1,367.57
905.72
1948
26,770.19
13,385.10
2,566.40
1,698.93
1949
11,335.25
5,667.63
1,133.28
725.52
1950
8,193.56
4,096.78
791.24
497.49
Issues presented by *95 the pleadings are the correctness of the respondent's action (1) in determining the petitioner's taxable income for 1946 through 1950 on the basis of increases in the petitioner's net worth during the respective years with adjustment for petitioner's personal and other nondeductible expenditures and for his capital gains, (2) in determining the amount of the petitioner's net worth at the beginning and at the end of the respective years, (3) in determining the amount of the petitioner's living expenses for the respective years, (4) in determining for the respective years additions to tax under section 293(b) of the Internal Revenue Code of 1939 for fraud with intent to evade tax, (5) in failing to determine that the assessment and collection of the deficiencies and additions to tax for the respective years are barred by the expiration of the period of limitations, (6) in determining for the respective years additions to tax under section 294(d)(1)(A) for failure to file declarations of estimated tax, and (7) in determining for the respective years additions to tax under section 294(d)(2) for substantial underestimation of tax. The respondent has conceded error as to Issue 7 thus leaving *96 the remaining issues for determination. General Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner's present address is Philadelphia, Pennsylvania. He filed his Federal individual income tax returns for 1946 through 1950 with the collector for the first district of Pennsylvania. At the time he filed his income tax returns for the foregoing years he resided at Morton, Pennsylvania. The petitioner was born in Tortoreto, Italy, in 1900 and came to the United States in 1920. He has completed 4 years of high school and additionally 3 years of correspondent schooling in electrical engineering and 3 years of night high school in electrical engineering. He married in 1926 and his wife died in 1929. He has never remarried and has no children. After arriving in the United States in 1920, the petitioner in that year entered the employment of the Pennsylvania Railroad Company and continued in its employment until about April 1930 when he ceased such employment. During the foregoing period the petitioner's employment was variously that of laborer, helper, machinist's helper, machinist, and locomotive inspector. His pay for the period beginning *97 with January 1924 and ending with the termination of his services about April 1930 totaled $11,993.10. Upon terminating his services with the Pennsylvania Railroad Company, the petitioner in 1930 started an automobile repair business at 315 Yale Avenue, Morton, Pennsylvania, which he continued to operate until late in 1933 or 1934 when he returned to Italy to visit his mother. On April 6, 1933, the petitioner rented from the Morton National Bank, Morton, Pennsylvania, a safe-deposit box which he vacated on December 8, 1933. No other box was rented by petitioner from that bank until November 26, 1952. Following his return from Italy in 1934 the petitioner resumed operation of the automobile repair business at 315 Yale Avenue. In 1936 he began the construction of a garage and showroom at 250 Yale Avenue which was completed in 1938. During the first part of 1940 the Ford Motor Company granted the petitioner an agency or dealership for handling products manufactured by it and the petitioner thereafter, trading under the name of Capriotty Motor Sales & Service, conducted the dealership business at 250 Yale Avenue, Morton, Pennsylvania. In May 1949, his dealership was terminated. As *98 a Ford dealer he sold new passenger automobiles and trucks and used automobiles and operated an extensive service department in which he repaired automobiles and sold parts and accessories, tires, tubes, gasoline, oil, and grease. After termination of his Ford dealership the petitioner received no more new automobiles from Ford Motor Company. However, he continued the sale of used automobiles, continued the operation of the service department, and as a sub-dealer obtained some new automobiles from Gash-Stull Motor Company. In addition to the foregoing business activities the petitioner during all or part of the years 1946 through 1950 owned rental real property, leased builders' equipment to others, conducted a fuel oil business, and owned and managed a dairy farm situated in Maryland. The petitioner filed no Federal income tax returns for the years 1923 through 1939. However, he filed returns for 1940 through 1945. The income tax return for 1940 was filed in 1947 and a tax of $161.75 was paid thereon during the latter year. On the income tax return for 1941 a tax of $79.11 was paid in 1942. The return for 1942 showed no tax liability. An estimated income tax of $31 paid in 1943 *99 for that year was refunded in full in 1944 following the filing of the income tax return for 1943. A declaration of estimated income tax filed in 1944 for that year showed an estimated tax of $47 of which $16 was paid during that year. Following the filing of the income tax return in 1945 the $16 was refunded in that year and the remaining estimated tax of $31 was abated in 1946. The income tax return for 1945 showed a tax liability of $27 which was paid in 1946. As a result of an audit by respondent of petitioner's income tax returns for the years 1943 through 1945 the following deficiencies in income tax were assessed and paid in 1947: 1943
$708.86
1944
538.00
1945
500.00
Issue 1. Determination of Income on the Basis of Increases in Net Worth With Adjustments for Personal and Nondeductible Expenditures and Capital Gains. Issue 2. Determination of Net Worth at the Beginning and at the End of the Respective Taxable Years. Issue 3. Determination of the Amount of the Petitioner's Living Expenses for the Respective Taxable Years. Findings of Fact During the years 1940 and 1941 the petitioner employed a bookkeeper. Thereafter, including 1946, the petitioner *100 himself kept his books. In 1946 he "reset" the books and put them in operation. For the taxable years subsequent to 1946 involved herein the petitioner employed a bookkeeper. The petitioner always handled the money relating to his business transactions and the bookkeeper handled the paper and paper work. During the taxable years in question the petitioner made sales for cash which were not recorded in his books and records. Not all of the cash receipts from the businesses of the petitioner were deposited in a bank but some were placed by him in a safe which he had at his place of business where he held them for future disposition. He did not maintain a record of the cash he placed in the safe from time to time. In the spring of 1951 Reuben Gershuni, a special agent of the Internal Revenue Service, and Joseph Kaiser, an internal revenue agent, were assigned to make an investigation of the petitioner's income tax liability for the years 1946 through 1950. The investigation began in the spring of 1951 and was concluded in December 1952. Kaiser was present at all major interviews by Gershuni of the petitioner. At the time of the initial interview, which occurred in August 1951 at the *101 petitioner's place of business, 250 Yale Avenue in Morton, Pennsylvania, Gershuni inquired of petitioner as to his earlier personal and business background and his business activities during the taxable years 1946 through 1950. In addition to telling Gershuni about his employment by the Pennsylvania Railroad Company, his automobile repair business, and the Ford Motor Company dealership which was terminated in May 1949, the petitioner told him that he had been in the building equipment business and had, about 1946, acquired the assets used therein, that he was in the dairy business and had acquired during the latter part of 1947 the farm used therein, and that he had been in the fuel oil business during the entire period 1946 through 1950. The petitioner told Gershuni that the only banks he had used were the Morton National Bank and the Swarthmore National Bank. The petitioner, however, also had used four other banks, namely, Ridley National Bank, First National Bank of Media, National Bank of Perryville, and Prospect Park National Bank. During the initial interview Gershuni asked the petitioner for all of his records of the taxable years 1946 through 1950, including bank statements, *102 canceled checks, and check stubs which pertained to the various businesses he had conducted during those years. The records which the petitioner submitted pursuant to the foregoing request and to repeated requests made at subsequent interviews consisted of the following: copies of financial statements submitted by petitioner to the Ford Motor Company for the years ended December 31, 1945, through December 31, 1948, new car invoices from Ford Motor Company, new car sales invoices, used car sales invoices to September 1950, a large number of loose sheets containing entries relating to the years 1947 through May 31, 1949, and which were maintained by petitioner under the system of accounting prescribed by the Ford Motor Company, a general ledger containing accounts relating to the Ford Motor Company system of accounting in which there were entries relating to 1947 and 1948 and to May 31, 1949, a small book containing only journal entries relating to the petitioner's acquisitions of the various units of his builders' equipment business and a ledger sheet based on those entries, and check stubs for checks drawn on the Morton National Bank during 1950. The records submitted by petitioner *103 with respect to the dairy farm related to 3 years and consisted of a "mass conglomeration" of loose sheets, paid bills, sheets of daily milk production of cows, and various kinds of miscellaneous data, all of which required about 3 weeks for one of the agents to assort. The copies submitted to the agents of the financial statements submitted by petitioner to Ford Motor Company for the years ended December 31, 1946, through December 31, 1948, disclosed inventories of parts and accessories, tires and tubes, gasoline, oil, and grease at the beginning and end of those years and also disclosed substantial receipts during those years from the sale of those items and from repairs. However, despite repeated requests by the agents for petitioner's underlying records with respect to the foregoing items, the petitioner never submitted any such records to them. Except for some new and used car records, no records were produced for 1946. Except for the check stubs submitted with respect to checks drawn on the Morton National Bank during 1950, no check stubs, deposit slips, bank statements, or canceled checks with respect to his account in any of the six banks used by him were submitted by petitioner *104 to the agents. The car records submitted by petitioner to the agents did not contain a long book or record showing each individual car on hand at any given time. Nor were any records with respect to the petitioner's fuel oil business submitted to the agents. The following is a statement of the total of petitioner's sales of cars, trucks, parts and accessories, tires and tubes, gasoline, oil, grease, and repairs, and the net profit for the years 1946, 1947, and 1948 as shown by the financial statements at the end of each of those years which the petitioner submitted to Ford Motor Company and as reported in his income tax returns for the respective years: Sales shown
Sales
Net profit shown
Net profit
in statement
shown in peti-
in statement
shown in peti-
Year
to Ford
tioner's return
to Ford
tioner's return
1946
$ 96,306.03
$17,810.96
$ 7,510.12
$ 701.58
1947
134,856.56
39,754.23
17,241.30
11,271.85
1948
129,860.32
56,539.59
27,994.24
25,898.67
The petitioner and Harold J. Bullman, a certified public accountant, first met in January or February 1952 when petitioner employed him to prepare his income tax return for 1951. At that *105 time, as well as afterwards, Bullman was regularly employed by a corporation as its accounting supervisor and head of its tax department. Following the conclusion in December 1952 of the investigation of the petitioner's income tax liability for 1946 through 1950 by respondent's agents, the petitioner during the winter or spring of 1953 was indicted in the United States District Court for the Eastern District of Pennsylvania for willful attempt to defeat and evade Federal income tax owing by him for the years 1946 through 1950. Subsequent to the indictment the petitioner discussed with Bullman the matter of Bullman making a reconstruction of his income for the years 1946 through 1950 for use in his (petitioner's) trial on the indictment. Bullman agreed to make such a reconstruction and informed the petitioner that his reconstruction undoubtedly would help him (petitioner) in his trial. Thereafter, from June 1953 until early in 1955, Bullman and two of his subordinates, at the place of his regular employment, worked on a reconstruction of the petitioner's income, working evenings, week ends, holidays, and vacations, but not to the detriment of their regular employment. For Bullman's *106 use in making his reconstruction of petitioner's income, the petitioner submitted to Bullman his books and a considerable quantity of underlying records, including canceled checks and bank statements for all of the six banks used by petitioner during 1946 through 1950, some but incomplete records relating to car repairs made by petitioner during the years 1947 through 1950, and some but incomplete records relating to oil, gas, tires, and tubes sold or used by the petitioner during the years 1946 through 1950. In submitting the foregoing to Bullman the petitioner told him that all those records had been made available by him to respondent's agents for their examination. From his examination of the "actual" books maintained by petitioner for the years in question in connection with the underlying records furnished him by the petitioner for those years, Bullman found that the books failed to contain considerable data which properly should have been recorded therein and concluded that the books were so incomplete and inadequate that they did not provide any basis for an examination requisite to the reconstruction of the petitioner's income. The petitioner's total net income from all *107 sources as reported in his income tax returns and as shown by Bullman's reconstruction and the increase or decease as shown by Bullman's reconstruction are as follows for the indicated years: Reported in
petitioner's
income tax
Bullman's
Year
return
reconstruction
Increase
Decrease
1946
$ 1,002.97
$ 9,066.02
$ 8,063.05
1947
10,574.51
17,171.02
6,596.51
1948
9,705.84
1,932.75
$ 7,773.09
1949
7,669.55
4,646.63
3,022.92
1950
4,256.78
(loss) 294.14
4,550.92
Total
$33,209.65
$32,522.28
$14,659.56
$15,346.93
On March 12, 1937, the petitioner borrowed $200 from the Morton National Bank and made repayment thereof on April 8, 1937. On June 30, 1938, the petitioner borrowed $2,000 from that bank and on September 1, 1938, borrowed an additional $1,000 from the same bank. Thereafter petitioner made payments ranging in amounts from $15 to $50 on the loans until August 6, 1940, when he paid $1,100 and thereby reduced the amount owing thereon to $1,000 which he paid in full on September 5, 1940. On January 14, 1941, the petitioner borrowed $500 from the same bank and made repayment thereof on February 13, 1941. Municipal liens *108 against the petitioner's property situated at 315 Yale Avenue, Morton, Pennsylvania, were filed as follows: (1) A sewer lien for $42.46 was filed July 14, 1937, because of the petitioner's failure to pay an assessment for laying sewer pipe in front of the property. (2) A curb lien for $33.12 was filed October 31, 1941, because of the petitioner's failure to pay an assessment for installing a curb in front of the property. (3) A sewer rent lien for $65.67 was filed December 31, 1941, because of the petitioner's failure to pay sewer rent with respect to the property for the years 1938, 1939, and 1940. The foregoing liens remained unsatisfied until July 8, 1944. In a selective service questionnaire sworn to by petitioner on June 20, 1942, and filed by him with his local selective service board, he stated that he was the sole support of his mother, Vincenza Capriotty, Tortoreto Stazione, Italy, a widow, age 76, that be began contributing to her support in 1934, and that during the preceding 12 months he had contributed $1,200 to her support and to the support of his 11-year-old niece whose father died in 1934 and of whom he also was the sole support and to whose support he also began *109 contributing in 1934. The petitioner's mother died in 1949. In his income tax return for 1947 the petitioner claimed a personal exemption for his mother. In his selective service questionnaire the petitioner also stated that he was the sole owner of the following businesses: Capriotty's Motor Sales & Service (Ford dealer), Builders Supply, and Fuel Oil Service, that his experience in the foregoing kinds of work was 19 years, 5 years, and 7 years, respectively, and that his average annual earnings were $15,000. He further stated that all of the "property, real and personal," owned by him, exclusive of "clothing, personal effects, household furnishings, or automobile," consisted of (1) business building and land which had a value of $75,000 after deducting encumbrances thereon and that his net income therefrom during the past 12 months was $8,000, and (2) two residence houses and building which had a value of $12,000 after deducting encumbrances thereon and that his income therefrom during the past 12 months was $4,360. No mention was made of any sum of money on hand. In a letter dated August 17, 1942, to his local selective service board in which he appealed from the board's action *110 in classifying him as 1-A, the petitioner stated, among other things, that "I am a Ford Dealer in this locality, which covers Morton, Swarthmore, Rutledge, Part of Springfield, Ridley Township and Secane. This establishment consists of an investment of approximately $104,250.00." The petitioner has never received any property by gift or inheritance. Being unable to compute petitioner's income from such records as he had submitted to the respondent's agents, and being unable to verify the income reported by petitioner in his income tax returns, and finding substantial increases in petitioner's net worth, the respondent determined the petitioner's income for the years 1946 through 1950 on the basis of the petitioner's increases in net worth for the respective years, plus amounts determined as petitioner's personal living expenses for such years, less excludable portion of capital gains as follows: YEARS 1946-1950 INCLUSIVE
NET WORTH STATEMENT
ASSETS
12/31/45
12/31/46
12/31/47
12/31/48
12/31/49
12/31/50
Cash in bank
$ 27,941.32
$ 40,436.63
$ 17,953.62
$ 22,847.05
$ 13,104.01
$ 27,588.83
Petty cash fund
100.00
200.00
100.00
100.00
Deals in transit
2,225.39
Accounts Receivable
1,200.00
1,500.00
2,518.03
3,265.32
4,332.81
4,329.19
Inventories
10,588.00
16,794.67
18,908.56
36,670.67
28,798.78
27,251.91
Finance Co. Reserve
400.00
500.00
99.66
823.07
U.S. Govt. Bonds -
Series "E"
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
U.S. Govt. Bonds -
Series "G"
35,000.00
35,000.00
Mortgage Receivable
43,400.00
54,000.00
Real Estate
79,243.22
80,684.91
150,416.73
150,685.81
131,885.44
143,663.24
Machinery & Shop Equpmt.
4,300.00
4,500.00
4,600.00
5,446.85
5,446.85
5,446.85
Service Cars
600.00
1,200.00
1,059.68
2,884.90
2,884.90
2,884.90
Office Furniture & Fixtures
800.00
800.00
800.00
800.00
800.00
800.00
Airplane
3,600.00
3,600.00
3,600.00
3,600.00
3,600.00
Builders' Equipment
14,525.00
4,325.00
4,325.00
4,325.00
Farm Equipment
8,546.01
10,552.92
13,352.53
Livestock
3,171.08
2,846.08
1,488.01
Prepaid Insurance
350.00
300.00
TOTAL ASSETS
$128,172.54
$153,566.21
$217,881.28
$248,409.15
$289,976.80
$326,730.46
LIABILITIES AND RESERVES
Accounts Payable
$ 550.00
$ 650.00
$ 972.11
$ 206.88
$ 915.77
$ 823.27
Notes Payable
30,000.00
Exchange
124.00
Accrued Salaries & Wages
159.41
Accrued Taxes
120.70
Reserve for Depreciation
5,608.35
7,389.41
10,653.34
15,453.92
21,946.54
27,370.54
TOTAL LIABILITIES AND
RESERVES
6,158.35
8,039.41
41,625.45
16,064.91
22,862.31
28,193.81
NET WORTH
$122,014.19
$145,526.80
$176,255.83
$232,344.24
$267,114.49
$298,536.65
Less: Previous years Net Worth
122,014.19
145,526.80
176,255.83
232,344.24
267,114.49
Increase in Net Worth
23,512.61
30,729.03
56,088.41
34,770.25
31,422.16
Add: Cost of Living
2,500.00
2,500.00
2,500.00
2,500.00
2,500.00
Income Taxes Paid
27.00
2,446.30
2,122.98
2,051.64
1,256.69
26,039.61
35,675.33
60,711.39
39,321.89
35,178.85
Deduct: Excluded portion of Capital
Gains
1,316.67
5,471.45
9,377.76
Adjusted Gross Income as corrected
26,039.61
35,675.33
59,394.72
33,850.44
25,801.09
Adjusted Gross Income as reported
1,002.97
10,574.51
9,705.84
7,669.55
4,256.78
Additional Income
$ 25,036.64
$ 25,100.82
$ 49,688.88
$ 26,180.89
$ 21,544.31
*111 The books and records maintained by the petitioner for the years 1946 through 1950 were inadequate for fairly or correctly reflecting his income for those years. On December 31 of the years 1945 through 1950 the petitioner had cash on hand in the amount of $100. The petitioner's inventories as of the indicated dates were in the following amounts: Year ended
December 31
Amount
1945
$10,588.00
1946
13,977.48
1947
15,127.47
1948
21,320.08
1949
18,629.34
1950
19,143.94
The petitioner's living expenses were $1,800 a year for each of the years 1946 through 1950. Opinion The first error assigned by petitioner in his petition and which was denied by respondent in his answer is as follows: Respondent, in making the determination of income tax deficiencies used the net worth method of arriving at taxable income. This method is unnecessary in this case as Petitioner's records were adequate to permit an accurate reconstruction of net income, which reconstruction has been made. In support of the foregoing assignment of error the petitioner relies on Bullman's reconstruction of his (petitioner's) income for the years 1946 through 1950 and the testimony *112 given by Bullman at the trial of the petitioner on his indictment. The petitioner takes the position that his records though incomplete were basically sufficient to enable Bullman to make a reconstruction of his income which substantially reflects his correct income for the years in question, that the reconstruction should be accepted as such, and the respondent's determination of income by the increase in net worth method set aside. The petitioner did not appear as a witness at the trial of the instant case. However, on July 10, 1952, he voluntarily made a written statement under oath to representatives of the respondent, sometimes hereinafter referred to as petitioner's statement of July 1952, in which he stated that Samuel S. Haring, who is now deceased, prepared his income tax returns for 1946 through 1950. Among the questions asked the petitioner on that occasion was where Haring's work papers for 1946 and 1947 and the garage account for 1948 were. Petitioner replied that he had had all of them but he could not find the work papers for 1946, that he cleaned his office in April 1951 and that he assumed all those records were burned at that time. When asked if he had any record *113 which indicated the improvement costs in each year from 1942 to 1949 of certain real property which he had stated that he had sold in 1949, the petitioner replied that he did not, that all records had been destroyed as soon as his income tax return was prepared or the statute of limitations expired and that all records were burned in April 1952. The petitioner also was asked a number of questions concerning the financial statements he had submitted to the Ford Motor Company during the time he represented that company as a dealer. The tenor of the petitioner's replies was such as to impeach the accuracy of the statements on the grounds that they represented "guesses," "all guesswork," were "absolutely incorrect," "never accurate," and in some instances false in that used cars were reported as having been sold when in fact the petitioner still held them for sale. The following contained in petitioner's statement of July 1952 is enlightening as to the petitioner's attitude toward truth and accuracy, whether in income tax matters or in business dealings: Q. I am looking at the copy of the financial statement to the Ford Motor Company, dated December 31, 1945, showing your assets and *114 liabilities. Cash on hand and in banks is shown at $12,000. Is that an accurate figure as to your cash position on December 31, 1945? A. Whatever that statement shows, it's not an accurate statement, because when we do business, we don't always tell what we own, just tell what we think necessary to do business. If the business I am doing with you only required a certain amount of my financial statement, that's the financial statement I give you. I am not giving you what I am worth, but I tell you I am worth $10,000. When I am dealing with the Ford Motor Company, I tell the Ford Motor Company I am worth $50,000. I don't have to tell them all I am worth, so I tell them what I think I have to have to do their business. [Italics added.] We have carefully considered Bullman's reconstruction of the petitioner's income for the years 1946 through 1950 and his testimony with respect thereto and are of the opinion that his testimony clearly shows that the petitioner's books and records were inadequate for fairly or correctly reflecting his income for such years. Bullman's testimony further shows that in making his reconstruction he, in various areas where there either were no records or *115 the records were incomplete, resorted to the use of unsupported oral statements of the petitioner, to statements contained in petitioner's income tax returns, to assumptions and estimates not shown to have been warranted and in some instances to assumptions based on assumptions. The integrity of a reconstruction of income so arrived at is not sufficient to sustain the contention of the petitioner that the reconstruction should be accepted as substantially reflecting his correct income for the years in question. Where the available records of a taxpayer do not fairly or correctly show his income the respondent may use the increase in net worth method in determining taxable income. Holland v. United States, 348 U.S. 121 (1954), rehearing denied 348 U.S. 932 (1955); Morris Lipsitz, 21 T.C. 917 (1954), affd. 220 F. 2d 871 (C.A. 4, 1955), certiorari denied 350 U.S. 845 (1955). Having heretofore found that the records maintained by petitioner for the years in question were inadequate for fairly or correctly reflecting his income, we are of the opinion that the respondent acted within his authority in employing the increase *116 in net worth method in determining his taxable income for those years. With respect to the respondent's determination of the petitioner's income by the increase in net worth method, the petitioner by stipulation has agreed, with three exceptions, to the correctness of the respondent's determination of his assets, liabilities, and reserves and the amounts thereof at the close of December 31 of the years 1945 through 1950, living expenses for, the excluded portion of capital gains for, and income taxes paid during the years 1946 through 1950 as appeared in the notice of deficiency and set out in our findings of fact. Two of the petitioner's exceptions, namely, petitioner's living expenses for the years 1946 through 1950 and petitioner's inventories at the close of December 31 of the years 1945 through 1950 also have been disposed of by stipulation of the parties, and the stipulated amounts of those items have been set out in our findings. The petitioner's other exception is as to the amount of cash on hand on December 31, 1945. The respondent determined the amount of the petitioner's cash in banks at the close of December 31 of the years 1945 through 1950 and the amount of the petitioner's *117 petty cash fund at the close of December 31 of the years 1945 through 1948 and the petitioner has agreed to the correctness of the amounts so determined. However, aside from the foregoing amounts of cash, the respondent has made no determination respecting the petitioner's cash on hand. As stipulated by the parties: The petitioner maintains that he had cash on hand in the amount of $112,895.34 on December 31, 1945. During the years 1946 through 1950, the petitioner maintains that he exhausted this fund by making certain expenditures and by transferring amounts to his bank accounts. The petitioner relying on pages 33-37 of his statement of July 1952 has requested that we find as a fact that during his visit with his mother in Italy, she there in 1934 gave him approximately $96,000 in Italian money as his share of the family savings with which to invest in business, that he exchanged the money in Italy for American dollars, returned to the United States, and then placed the money, along with savings he had accumulated prior to his trip to Italy, in a safe in his home. Although the portion of the statement relied on by petitioner in general tends to support the requested finding, *118 the portion of the statement relied on is discredited by other portions of the record. During the investigation by respondent's agents of the petitioner's tax liability for the years in question the petitioner stated that in 1933 he made a visit to his mother in Italy and that she gave him Italian lira which he exchanged into $96,000 of American currency of $1,000 denominations, that he put the money in a money belt, strapped it about himself, returned to the United States and to Morton, Pennsylvania, and on the following day put the money in a safe-deposit box at Morton National Bank. Thereafter, in his statement of July 1952, the petitioner stated that for the Italian lira his mother gave him, he obtained American currency in Italy in denominations of from $50 up, that the American currency was brought to the United States beneath the lining of his travel bag which he lifted and after placing the currency thereunder repasted, and that he never kept any of the currency in a safe-deposit box but at all times kept it in a 5 1/2 ton safe which he purchased in 1932 or 1934 and which he had in his home. The stipulated facts show that on December 8, 1933, the petitioner vacated a safe-deposit *119 box at Morton National Bank which he had rented on April 6, 1933, and that he rented no other box there until November 26, 1952. The petitioner has made no attempt to reconcile the conflicts in his foregoing statements. In his selective service questionnaire sworn to by him on June 20, 1942, the petitioner stated that he was the sole support of his mother, a widow, to whose support he began contributing in 1934 and that during the preceding 12 months he had contributed $1,200 to her support and that of his 11-year-old niece in Italy whose father was dead. In his income tax return for 1947 the petitioner claimed a personal exemption for his mother. During the investigation by respondent's agents for the years in question the petitioner stated that he claimed a personal exemption for his mother in 1947 because he was supporting his mother in Italy. The petitioner has made no attempt to explain why his mother would give him or why he would accept from her such a substantial sum as $96,000 when to do so would render her thereafter destitute of a means of support and make her dependent solely on him. Beginning in March 1937 and continuing into January 1941, the petitioner obtained *120 several loans from Morton National Bank ranging in amounts from $200 to $2,000. During the period July 1937 to December 1941, three liens ranging in amounts from $33.12 to $65.67 were filed against the petitioner's property at 315 Yale Avenue in Morton, Pennsylvania, on account of his failure to pay assessments against the property for installing sewer pipe and curb and failure to pay sewer rent with respect to the property for the years 1938 through 1940. The foregoing liens remained unsatisfied until July 8, 1944. The petitioner offers no explanation why, if he had been in receipt of $96,000 in 1934, it was necessary for him to obtain the foregoing comparatively small loans or why he delayed in making payment of the small assessments against his property when due. Respecting the use made of the $96,000 which he stated his mother gave him and the amounts thereof remaining on hand in later years, the petitioner stated during the investigation by respondent's agents that $36,000 thereof was used to build a showroom at 250 Yale Avenue in Morton, construction of which was begun in 1936 and completed in 1938, that he did not know the amount of cash he had on hand as of January 1, 1946, that *121 any monies he had were mixed in the business as it grew up and that he did not know how much cash he had on hand on December 31 of the years 1946 through 1949 since his money was all mixed up as he grew up in business. Thereafter the petitioner made his statement of July 1952 which contains the following: Q. How many American dollars did you receive for your lira? A. I am not prepared to make any statement but I know it was high, in a good many thousand dollars, close to $100,000 at that time for the sale of the Italian money with that sum; and that was the cause for me to buy a safe, a big safe, to store the money and spend money accordingly, which I done it from that year on; and that's how the money accumulated, in and out of the bank, invested, and, as I said, I don't know how the money stands, because I control it all and did control it all, and, therefore, is not much to worry where the money goes. That is why I did never take an accurate inventory where the money is. Q. At what time was this money finished? A. This money was never finished really, because it was invested over again to buy properties and build buildings. Q. When had you completely spent this money, *122 or put it in a bank? A. I can't answer you that question because I never went broke. Q. What I mean is - when did you completely spend this money and had other assets in place of this money? A. I can't answer you that question clear - when this money ended - because this money was mixed as I grew up in the business. * * *
Q. What was the largest amount of money you ever had in your safe? A. Well, I would not know myself, because I never made an inventory how much money would be in the safe. Just one of those things - you put so much money there but you don't know how much is in there. Q. You mean to say you would not know if you had $5,000 or $10,000 in the safe? A. No, because I make a deal, I put one deal in there, and then I make another deal and I dump that in there, but not all the time I knew how much money I would have in the safe. Q. Did you ever have more than $10,000 in your safe, Mr. Capriotty? A. Yes, I did. Q. How do you know? A. I figure so. Q. Since you figured that you had more than $10,000 in there, how much did you have at any time? A. Because all the money didn't accumulate in a year - all the profit didn't accumulate in a year, you, *123 in time, don't know yourself how much money you would have on hand. You couldn't say you made this money in one year or in various years, in one or two years, but made it over so many years. * * *
Q. How much cash did you have in your safe at the end of 1945 after you had bought a lot of properties? A. I have no recollection really what I had, because, as I told you before, I never took accurate inventory of my money which lay around. I wouldn't know even now how much I own, how much I have around the place. From our consideration of what has been set out above, together with the remainder of the record bearing on the question, we are unable to find that the petitioner either in 1933, 1934, or in any other year, received $96,000 or any other substantial amount of money from his mother. Accordingly since the petitioner in his statement of July 1952 stated that he never had received by inheritance or gift any other property, we have found as a fact that the petitioner has never received any property by gift or inheritance. From the evidence presented we are unable to find that petitioner had cash on hand in the amount of $112,895.34 on December 31, 1945. However, we are *124 satisfied that on that date and on December 31 of the years 1946 through 1950 he had some cash on hand, the amount of which we are unable to determine with exactness. Consequently we have applied the rule of Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), and found that the amount thereof was $100. Issue 4. Additions to Tax for Fraud With Intent to Evade Tax Findings of Fact The petitioner's income tax returns for the years 1946, 1947, 1948, 1949 and 1950 were false and fraudulent and were made with intent to evade tax. Part of the deficiency for each of the years is due to fraud with intent to evade tax. Opinion The respondent has determined against petitioner for the years 1946 through 1950 the addition to tax provided in section 293(b) of the Code of 1939 for fraud. The respondent has the burden of proof as to this issue and contends that the record establishes the correctness of his action. The petitioner contends that the respondent has failed to discharge his burden of establishing fraud. After making the adjustments in the net worth statement of the petitioner for the years here involved as required by our findings of fact as to cash on hand and *125 inventories and giving effect to our findings as to the petitioner's living expense, there remains for each of the years an amount of income, determined on the basis of increases of the petitioner's net worth, which is substantially in excess of that reported by the petitioner in his income tax returns for the respective years. The question for determination here is whether those excess amounts were fraudulently omitted by the petitioner from his income tax returns with an intent to evade tax. The petitioner has completed 4 years of high school and has had 6 additional years of schooling in electrical engineering. He is an able and successful business man. In 1920 he arrived in the United States from Italy and began work as a laborer and in subsequent years advanced to the work of a machinist and locomotive inspector. In 1930 he terminated his then employment and started an automobile repair business of his own. Although he has never received any property by gift or inheritance, yet according to his own statements made in 1942 his then average earnings were $15,000 annually, his investment in his Ford dealership and repair business was approximately $104,250, and he owned two residence *126 houses and a building which had a net value of $12,000, or assets totaling $116,250. The petitioner married in 1926. His wife died in 1929. He has never remarried and has no children. He filed no Federal income tax [returns] for the years 1923 through 1939, filed his 1940 income tax return in 1947, paid a tax of $79.11 in 1942 on his income tax return for 1941, and filed an income tax return for 1942 which showed no tax liability. Estimated income taxes of $31 paid for 1943 and $16 for 1944 were refunded after the petitioner filed his income tax returns for those years. A tax liability of $27 reported on his return for 1945 was paid in 1946. With the foregoing history of income tax payments, the petitioner himself in 1946, and after having kept his own books since 1941, set up books purporting to reflect correctly his income and put into operation the method of keeping them which was employed in that and the subsequent years involved herein. On occasions records essential to a correct determination of income were destroyed as soon as an income tax return was prepared or at some other time prior to a final determination of tax liability on the return. There is evidence in the record *127 that in the preparation of petitioner's income tax return for 1946 Haring sat at one end of a table, the petitioner sat at the other end and called off the amounts which Haring entered in the return. From the record before us we are satisfied that petitioner exercised equally as much control as to the amounts Haring entered in the returns for the subsequent years in controversy. The petitioner was aware of the inadequacy of his books and records for correctly reflecting his income and knew that the amounts of income reported in his returns for the years in question were not correct. Being aware that the investigation then being conducted by respondent's agents for the years 1946 through 1950 would disclose substantially larger amounts of income for those years than he had reported, the petitioner withheld from the agents a substantial portion of his records which after his indictment he submitted to Bullman. The petitioner also presented the agents with his discredited statement of his receipt of a large gift of cash from his mother in a foreign country, who had since died, obviously with a view to misleading the respondent and his agents and concealing his true income from them. The *128 petitioner's conduct respecting his tax liability for the years here involved is evidence of fraud with intent to evade tax. Spies v. United States, 317 U.S. 492 (1943). The respondent's determination of the additions to tax for fraud is sustained. Issue 5. Failure of Respondent to Determine That Assessment and Collection of the Deficiencies in Tax and Additions to Tax Are Barred by the Expiration of the Period of Limitations Opinion Since section 276(a) of the Code of 1939 provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time, and since we have heretofore found that the petitioner's returns for the years in question were false and fraudulent and were made with intent to evade tax, we hold that the assessment and collection of deficiencies in the petitioner's tax and additions to tax for the years here involved are not barred. The respondent is sustained as to this issue. Issue 6. Additions to Tax for Failure to File Declarations of Estimated Tax Opinion Section 294(d)(1)(A) imposes an addition to tax *129 in case of failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to be due to reasonable cause and not to willful neglect. The petitioner has the burden as to this issue. The petitioner points us to nothing in the record and we find nothing to indicate that he filed declarations of estimated tax for the years in question or that his failure to file the required declarations was due to reasonable cause and not to willful neglect. The respondent's action as to this issue must be sustained. Decision will be entered under Rule 50.